IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TINA L. P.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 19-cv-1203-MAB[2] |
| | ) |
| COMMISSIONER of SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Income Security (SSI) benefits pursuant to 42 U.S.C. § 423.

## PROCEDURAL HISTORY

Plaintiff applied for DIB in November 2013, alleging disability as of July 30, 2013. After holding an evidentiary hearing, an ALJ denied the application on October 3, 2016. (Tr. 11-25). The Appeals Council affirmed that decision. Plaintiff then appealed that decision to this Court, and the case was remanded to the Appeals Council who then remanded it to the ALJ on January 18, 2019. After a supplemental hearing, the ALJ denied

---

[1] In keeping with the court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See*, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 11 & 15.

the application on October 7, 2019. (Tr. 909-25). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following points:

1. The period of disability should be from July 20, 2013, through the date of the hearing decision at issue, dated October 7, 2019.

2. The ALJ failed to properly evaluate residual functional capacity (RFC).

3. The ALJ failed to properly evaluate Step 2 of the sequential evaluation.

4. The ALJ failed to fully and fairly develop the record.

## APPLICABLE LEGAL STANDARDS

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show that there are jobs existing in significant numbers in the national economy which the plaintiff can perform. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See, Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **THE DECISION OF THE ALJ**

The ALJ followed the five-step analytical framework described above. He determined that Plaintiff engaged in substantial gainful activity from March 26, 2018, and continuing. The ALJ determined that Plaintiff, "worked after the alleged disability onset date but this work activity…did not rise to the level of substantial gainful activity from the alleged onset date, July 30, 2013, and prior to March 26, 2018." (Tr. 913). She is insured for DIB through December 31, 2023.

The ALJ found that Plaintiff had severe impairments of degenerative disc disease, meniscal tear of the left knee, fibromyalgia, depression, anxiety, and personality disorder.

The ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ found that Plaintiff had the residual functional capacity (RFC) to perform light work:

> Specifically, the claimant can lift/carry 20 pounds occasionally and 10 pounds frequently; can stand/walk a total of six hours in eight and sit a total of six hours in eight; can never climb ladders, ropes or scaffolds; can occasionally balance, kneel, crouch, crawl, stoop and climb ramps and stairs; cannot be exposed to whole body vibration; can never push/pull leg levers, though she can operate ordinary foot pedals; can do simple, routine tasks that can be performed independently and that involve working primarily with things rather than with other people; and beyond that, interaction with coworkers, supervisors, and the general public must be superficial, defined as no mediation, arbitration, negotiation or confrontation of others or supervisions of others.

Tr. (916-17).

Based on the testimony of a vocational expert (VE), the ALJ concluded that

Plaintiff is unable to perform past work yet concluded there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

## THE EVIDENTIARY RECORD

The Court reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to Plaintiff's arguments.

**1.     Agency Forms**

Plaintiff was born in 1967 and was 52 years old on the date of the ALJ's decision. (Tr. 233). Plaintiff said she stopped working in July 2013 because of her conditions and other reasons. She previously worked as a secretary for the municipal government from November 2001 to November 2002; a legal assistant for a personal injury law firm from March 2003 to June 2004; an architectural administrative assistant from August 2004 to February 2008; a retail cashier from November 2008 to July 2013; and a security/property management administrative assistant from August 2009 to November 2009. (Tr. 189-90).

In a Function Report submitted in March 2014, Plaintiff said she has insomnia and mental problems. Plaintiff said she is tired and irritable. (Tr. 217-18). Plaintiff said her conditions affect her memory, task completion, concentration, understanding, instruction-following, and ability to get along with others. Plaintiff said she is "spacy" and zones out. Plaintiff said she can pay attention for two hours, is moody and irritable, and the number of medications she is on make her tired, irritable, and have poor, blurred vision. (Tr. 222-24).

## 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in May 2016. (Tr. 43-66). Plaintiff was not represented by an attorney at the evidentiary hearing in August 2019. (Tr. 935).

At the evidentiary hearing in August 2019, Plaintiff said she started working at Brown & Brown as a paralegal in March of 2018. (Tr. 940). Plaintiff said she could get terminated any day because she missed too much work already by going through all her vacation and sick time. Plaintiff says she has a lot of psychiatric and therapy appointments. Plaintiff indicated she has trouble coping, loses focus, and forgets a lot. Plaintiff said she has frequent panic attacks, poor judgment, and mood swings. Plaintiff also stated she has suicidal thoughts and acted on them a few times. Plaintiff noted that she struggles from PTSD and suffered sexual and physical abuse. Plaintiff said she was once homeless and did drugs. She said she does not work well with others, is unable to think straight, and has mind fog. (Tr. 943-948).

A vocational expert (VE) testified at the hearing in May 2016 but not at the hearing in August 2019. (Tr. 59, 935-51). The ALJ presented hypotheticals to the VE which corresponded to the ultimate RFC findings, and the VE testified that a person with Plaintiff's RFC could do light jobs such as a cleaner or housekeeper, a laundry worker, or machine tender. (Tr. 62).

## 3. Relevant Medical Records

Plaintiff presented to Good Samaritan Medical Center on January 8, 2002, and a mental status examination revealed Plaintiff was oriented, alert, and had a normal mood

and affect. (Tr. 276, 278, 281).

Plaintiff presented to Freddy Avni, a gastroenterology specialist, six times between November 2010 and November 2011 reporting depression. (Tr. 335, 338, 341-42, 344, 1255-56, 1259). Dr. Avni noted Plaintiff was pleasant, had good attention, and was in no apparent distress. (Tr. 336, 339, 342, 345, 1256, 1259).

Plaintiff presented to Andre Celestin, a family medicine specialist, on January 5, 2011. (Tr. 329). A mental status exam revealed Plaintiff was well, alert, and oriented. (Tr. 331).

Plaintiff presented to the Family Choice Medical Clinic four times between June 2011 and April 2012. Mental status examinations revealed Plaintiff was alert and oriented to time, place, and person. (Tr. 350, 358, 366-67).

Plaintiff presented to Chinyere Mbaeri, a family medicine specialist at Wellington Regional Medical Center, fifteen times between August 2012 and March 2014, reporting psychosocial stressors; generalized weakness; fatigue; lethargy; feeling depressed; worsening anxiety; and insomnia. (Tr. 377, 379, 402-03, 420, 425, 444, 450, 453-58, 460-61, 489-90). Dr. Mbaeri noted Plaintiff was teary-eyed; had a very liable affect; had a depressed and blunted affect; was subdued-looking; was anxious; and was alert and oriented to time, place, and person. (Tr. 378, 381-82, 402-03, 425, 444, 453-58, 460-61, 489-90). The assessments included depression, anxiety, and insomnia, and plans included counseling, medications, and rest. (Tr. 379, 382, 402-03, 425, 450, 456, 489-90).

Plaintiff presented to Family Choice Medical Clinic on November 30, 2012, reporting increased anxiety due to increased psychosocial stressors. The assessment

included anxiety and depression, and plans included medications. (Tr. 435).

Dr. Mbaeri filled out a physician statement on December 14, 2012, saying Plaintiff has anxiety and depression, is able to work full-time, and has no limitations. Dr. Mbaeri indicated the expected length of recuperation/disability is indeterminate. (Tr. 445).

On December 17, 2012, Plaintiff received a work note from Dr. Mbaeri that released her from work until December 20, 2012. (Tr. 443).

Plaintiff presented to Alka Aggarwal, a family medicine specialist, on January 30, 2014, reporting anxiety and surviving on Xanax to get through life. A mental status examination revealed Plaintiff was anxious; had poor judgment; had pressured speech; and was oriented to time, place, person and situation. Dr. Aggarwal noted Plaintiff threatened suicide at the visit when he told her he could not give her Xanax right away. The assessment included anxiety and depression, and plans included medication and non-pharmaceutical methods of reducing anxiety. (Tr. 474-77).

Plaintiff presented to John Oshodi, a licensed psychologist and state agency consultant, for a psychological evaluation on March 18, 2014. (Tr. 484). Dr. Oshodi noted Plaintiff continued to "evidence highly irritable behaviors that could affect her ability to adequately focus on tasks." Dr. Oshodi said Plaintiff's ability to "perform tasks that require competitive skills or sustained persistence remains poor as she is easily distracted by her angry and irritable behaviors." Dr. Oshodi noted Plaintiff had obvious signs of excessive worry, sadness, and anger; and her ability to perform activities of daily living was fair. Dr. Oshodi said, "Her ability to adequately perform work activities and fully function under pressure remains highly limited as evidenced by her indicated difficulties

marked with irritability, low frustration tolerance, angry emotions, and drug abuse." (Tr. 487).

Plaintiff presented to St. Mary's Hospital on April 8, 2014. A mental status examination revealed Plaintiff was alert and oriented to person, place, time, and situation; had normal behavior; had a normal mood and affect; and was in no acute distress. (Tr. 492-94).

Plaintiff presented to Sarah Gebauer, a family medicine physician at Belleville Family Health Center, on September 12, 2014, reporting anxiety; fearful thoughts; difficulty concentrating; difficulty falling asleep and staying asleep; diminished interest or pleasure; depressed mood; poor judgment; and restlessness. (Tr. 719-20). A mental status examination revealed Plaintiff was oriented to time, place, person, and situation, and she had an appropriate mood and affect. (Tr. 722). The assessment included benzodiazepine dependence, anxiety, and depression, and plans included medication modifications for mental health and sleep. (Tr. 719).

Plaintiff presented to Belleville Family Health Center over twenty-five times between September 2014 and August 2018.[3] At these appointments, Plaintiff reported depressive disorder; panic disorder, personality disorder; PTSD; excessive worry; anxiety; restlessness; anhedonia; lack of motivation; dysphoria; high irritability; abnormal sleep; emotional lability; grieving; palpitations; chest pain; sweating; tachypnea; feeling dizzy, faint, tremulous, and like she is going crazy; fear of dying;

---

[3] Tr. 534, 539, 544, 552, 559, 562, 565, 569, 572, 576, 578, 581, 584, 588, 591, 594, 598, 624, 633, 698, 829, 838, 842, 869, 1133, 1343, 1347, 1351.

feeling flushed; headaches; an inability to relax; social withdrawal; suicidal ideations; difficulty concentrating; dramatic change in appetite; impulse control; self-mutilation; and hypervigilance of surroundings.[4] During the various appointments, Plaintiff's providers noted she was cooperative; calm; anxious at times; agitated and oppositional; had a euthymic mood; a sad mood; an irritable mood; was agitated at times; was oriented to situation, time, place and person; was alert; had intact judgment, insight, and thought processes; had impaired insight and judgment at times; had unremarkable thought content at times; had a pleasant and happy affect at times, had a flat and constricted affect at times; had a sad and tearful affect at times; and had an angry and hostile affect at times.[5]

Assessments included depressive disorder, anxiety, panic disorder, personality disorder, and borderline personality disorder.[6] Plans included medication modifications; therapy; self-care; taking part in positive activities and relaxation techniques each day; medication for sleep; referrals; education on mood disorders; dietary changes; medications for better sleep; and lab work monitoring.[7] Additionally, Plaintiff made statements at some of these appointments stating she felt the medications were helping her mood. (Tr. 539, 552, 572). However, she also stated uncertainty at times as to whether

---

[4] Tr. 535, 540, 544, 548, 553, 559, 562, 564, 566, 569, 572-73, 576, 578, 581, 584, 588-89, 591, 594-95, 598-99, 624, 626, 633, 635, 698, 829-30, 838-39, 843, 869-70, 1133, 1135-36, 1343, 1345-47, 1349-51, 1353-54.
[5] Tr. 538, 543, 546, 555, 560, 563, 568, 570, 575, 586-87, 593, 597, 601, 626, 635, 698, 832, 836, 840, 845, 871, 1136, 1346, 1350, 1354.
[6] Tr. 534, 539, 546-47, 552, 560, 563, 565, 570-72, 577, 579, 582, 584, 589, 591, 594, 598, 626, 636, 698, 829, 840, 842, 871, 1136-37, 1346, 1350, 1354.
[7] Tr. 534, 539, 546-47, 552, 560, 565, 570, 572, 577, 579, 582, 584, 589, 591, 594, 598, 626, 636, 698, 829, 840, 842, 872, 1136-37, 1346, 1350, 1354.

the medications were helping or not. (Tr. 1137).

On February 5, 2015, Plaintiff presented to Katherine Temprano, a rheumatologist, reporting headaches, cognitive dysfunction, behavior changes, depression, and mental status changes. (Tr. 766). The assessment included depression, and Dr. Temprano said Plaintiff's history of trauma likely contributes to her pain syndrome. (Tr. 774). Plaintiff underwent a Multi-Dimensional Health Assessment Questionnaire, reporting she has much difficulty getting a good night's sleep, dealing with anxiety or being nervous, and dealing with feelings of depression. Plaintiff reported fatigue was a major problem. (Tr. 762).

Plaintiff presented to Dr. Temprano on March 11, 2015, reporting fatigue and psych issues. (Tr. 784). The assessment included depression, and plans included continuing treating her mental health symptoms. (Tr. 796).

Plaintiff called Belleville Family Health Center on May 6, 2015, saying she was having panic attacks all day and needed Xanax. (Tr. 553). The same day, Plaintiff presented to Dr. Gebauer. (Tr. 670). A mental status examination revealed Plaintiff had poor insight and was anxious and depressed. (Tr. 673). The assessment included depressive disorder. (Tr. 671).

Plaintiff presented to Bart Worthington, a family medicine physician at Belleville Family Health Center, four times between August 2015 and May 2016. (Tr. 621, 627, 650, 825). Dr. Worthington noted Plaintiff had good judgment; had a normal mood and affect; was alert; and had poor insight. (Tr. 623, 629, 653, 827).

Plaintiff presented to HSHS Southern Illinois Division on November 13, 2015,

reporting anxiety. (Tr. 508, 510). A mental status examination revealed Plaintiff was alert and oriented to time, place, and person. (Tr. 511). The diagnosis was anxiety neurosis, and plans included medications. (Tr. 516).

Plaintiff presented to Adam Stenger, an emergency medicine physician, at St. Elizabeth's Hospital, on December 10, 2018, reporting night sweats, anxiety, and depression. (Tr. 1139, 1148). Dr. Stenger noted Plaintiff was oriented to person, place and time; had a normal mood and affect; had normal judgment and thought content; and had normal behavior. (Tr. 1142, 1167). The assessment included depression and plans included continuing medications. (Tr. 1152).

Plaintiff presented to Marianne Guthrie, an advanced practice nurse practitioner at St. Elizabeth's Interventional Pain Management Center, on February 19, 2019, reporting disturbed sleeping habits, headaches, depression, and anxiety. APNP Guthrie noted Plaintiff was alert and oriented; followed directions and answered questions appropriately; and was calm, pleasant and cooperative. (Tr. 1362-63).

In a letter dated July 8, 2019, Jessica Epperson, a licensed clinical social worker at Belleville Family Health Center, said Plaintiff should have met the criteria for PTSD prior to the diagnosis in 2017. However, it was not documented at that time. (Tr. 1319).

## ANALYSIS

Plaintiff's first issue (*i.e.* the period of disability should be from July 20, 2013, through the date of the hearing decision, dated October 7, 2019) is interconnected with the second, third, and fourth issues raised and, therefore, the Court's views regarding it are implied throughout its analysis.

Accordingly, the Court begins with Plaintiff's second issue, which takes aim at the ALJ's evaluation of her RFC. In short, Plaintiff asserts that the ALJ cherry-picked and ignored certain evidence in evaluating her RFC.

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Moreover, the ALJ must "engage sufficiently" with the medical evidence. *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). The ALJ "need not provide a complete written evaluation of every piece of testimony and evidence." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (citation and internal quotations omitted). However, the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations omitted). The ALJ "cannot simply cherry-pick facts supporting a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Plaintiff's argument revolves around the mental status examinations. Plaintiff argues that the ALJ ignored mental status examinations that conflicted with his ultimate conclusion. After a thorough review of the ALJ's decision and the medical records, it is true that there are many objective findings that reflected normal mental status examinations. Still, it is evident that the ALJ did not engage sufficiently with the evidence contrary to his ultimate decision.

Defendant argues that the ALJ noted Plaintiff's subjective complaints, yet she still

had normal mental status examinations. What Defendant is missing, like the ALJ, is an accurate representation of the volume of abnormal mental status examinations. There were many objective findings where Plaintiff had abnormal mental status examinations when presenting to Dr. Mbaeri, Dr. Aggarwal, Dr. Worthington, and Belleville Family Health Center, with the majority of those findings coming from visits at Belleville Family Health Center. The lack of attention to these findings requires remand as the ALJ failed to provide a logical bridge between the evidence and his conclusions.

Plaintiff also argues that the ALJ erred by saying, "the claimant reported improvement and stability with medication . . . ." (Tr. 919). Plaintiff emphasized that she only said Cymbalta helped her mood but never said that the medications were "controlling" her symptoms. Defendant suggests Plaintiff is nit-picking, and this Court agrees. This argument exudes a level of nit-picking that is not enough on its own to require remand.

Third, Plaintiff argues that the ALJ erred in not identifying insomnia as a severe impairment at Step 2. Plaintiff acknowledges that a failure to find an impairment as "severe" during Step 2 can be harmless error, but Plaintiff alleges that the ALJ failed to consider the combined effects of Plaintiff's impairments which changed the outcome of the case.

The failure to designate insomnia as a severe impairment, by itself, is not an error requiring remand. At Step 2 of the sequential analysis, the ALJ must determine whether the claimant has one or more severe impairments. This is only a "threshold issue," and, as long as the ALJ finds at least one severe impairment, he must continue with the

analysis. And, at step 4, he must consider the combined effect of all impairments, severe and non-severe. Therefore, a failure to designate a particular impairment as "severe" at Step 2 does not matter to the outcome of the case as long as the ALJ finds that the claimant has at least one severe impairment. *See Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) (citing *Castile v. Astrue*, 617 F.3d 923, 927-928 (7th Cir. 2010)).

The ALJ found Plaintiff had the severe impairments of degenerative disc disease, meniscal tear of the left knee, fibromyalgia, depression, anxiety, and personality disorder. It is true that regardless of the designation of impairments as severe, the ALJ is still required to consider the combined effects of all impairments in determining Plaintiff's RFC. "When assessing if a claimant is disabled, an ALJ must account for the combined effects of the claimant's impairments, including those that are not themselves severe enough to support a disability claim." *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018).

Nevertheless, Plaintiff's argument seems quite speculative. Plaintiff does not argue that there are a multitude of medical records to support a heavier discussion of insomnia in relation to her other impairments. Plaintiff simply points to many subjective complaints of insomnia, orders for insomnia medications, and a "Neuro/Psychiatric" Review that was positive for insomnia and sleep issues. More specifically, Plaintiff points to a note in which Dr. Temprano said certain impairments "are likely contributing to her pain syndrome." (Tr. 774). However, pain syndrome is not the same as insomnia, so the attempted connection there is lost. In a bid to further support her argument, Plaintiff seems to be reaching by saying one can lead to the other. Plaintiff's assertion is speculation and asks the ALJ to draw medical conclusions without medical evidence to

support it.

Lastly, Plaintiff suggests the ALJ failed to fully and fairly develop the record. To support this assertion, Plaintiff points out that she was unrepresented at the evidentiary hearing. Plaintiff argues the ALJ failed to ask if she wanted an attorney and never informed her of her right to representation. Plaintiff also argues the ALJ erred in failing to develop the issue of whether Plaintiff was accommodated at work for her impairments, which, according to Plaintiff, would extend her eligibility for benefits past March 25, 2018.

In his decision, the ALJ said, "Although informed of the right to representation, the claimant chose to appear and testify without the assistance of an attorney or other representative." (Tr. 909). It is true that the ALJ did not inform Plaintiff of her right to an attorney during the second evidentiary hearing in August 2019. However, Plaintiff did receive a packet in May 2019 titled "NOTICE OF HEARING" in which Plaintiff was informed of her right to representation. (Tr. 1074). Furthermore, "so long as it contains the required information, written notice adequately apprises a claimant of his right to counsel." *Jozefyk v. Berryhill*, 923 F.3d 492, 497 (7th Cir. 2019).

An ALJ has an independent duty to develop the record fully and fairly. 20 C.F.R. § 404.1512(b). "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits [internal citation omitted]." *Sims v. Apfel*, 120 S. Ct. 2080, 2085 (2000). That duty is enhanced where plaintiff was pro se at the agency level. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). "Where the disability benefits claimant is unassisted by counsel, the ALJ has a duty to 'scrupulously and conscientiously probe into, inquire of,

Page **16** of **18**

and explore for all the relevant facts . . . .'" *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991). An ALJ satisfies their duty to develop the record when the ALJ investigates for possible disabilities and discovers all relevant evidence. *Jozefyk*, 923 F.3d at 497. To prove the ALJ failed, "the claimant must point to specific, relevant facts that the ALJ did not consider." *Id*.

Plaintiff argues that, if she were represented by counsel, said counsel would have inquired with Brown & Brown, LLP's management regarding Plaintiff's limitations at work due to her impairments. This, according to Plaintiff, could have reduced Plaintiff's work activity to less-than substantial gainful activity and could be the difference between finding Plaintiff eligible for a closed period of disability versus a period from July 30, 2013, through a later date. (Doc. 20, p. 15).

It is true, as stated above, that an ALJ's duty is enhanced when the claimant is unrepresented by counsel. However, Plaintiff's argument here is unconvincing. Plaintiff argues that she is accommodated at her job at Brown & Brown, LLP, and that the ALJ should have determined the extent of that accommodation. However, to support this assertion, Plaintiff cites to her testimony during the August 2019 evidentiary hearing in which she explained how she has trouble with work. Plaintiff suggests this testimony shows she, "in essence," is accommodated at work, but the Court disagrees. Plaintiff did not suggest in her testimony at the August 2019 hearing that she was accommodated at work. Instead, the ALJ gave Plaintiff the floor to openly speak of anything regarding her impairments and disability application. Additionally, her brief does not suggest any actual accommodations more than the typical vacation and sick leave allotted to

employees. That, in effect, does not count as an accommodation unique to Plaintiff's impairments and situation. If the Court accepted Plaintiff's argument, that would force the ALJ to read Plaintiff's mind. In short, the ALJ is not required to be a clairvoyant. Additionally, the ALJ cannot force counsel upon Plaintiff in order to guarantee every piece of relevant information is considered and investigated. In sum, Plaintiff was adequately notified of her right to representation, and the ALJ's efforts to explore all the relevant facts were exhaustive.

This Memorandum and Order should not be construed as an indication that the Court believes Plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

DATED: September 16, 2020

/s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**